IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

Civil Action No. 12-cv-00487-MOC-DCK

| | |
|---|---|
| DAVID HOLMES, individually and on behalf of a Rule 23 putative class,<br><br>Plaintiff,<br><br>v.<br><br>BANK OF AMERICA, N.A., in its own capacity and as successor by merger to BAC Home Loans Servicing, L.P., and ILLINOIS UNION INSURANCE COMPANY<br><br>Defendants. | **BANK OF AMERICA'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS** |

# TABLE OF CONTENTS

                                                                                                **Page**

INTRODUCTION .................................................................................................................. 1

FACTUAL BACKGROUND ................................................................................................ 2

    I.       Plaintiff's Allegations .................................................................................................. 2

ARGUMENT .......................................................................................................................... 4

    I.       Applicable Law ........................................................................................................... 4

    II.      Plaintiff Fails to Identify Any Contractual Term That Was Breached. ...................... 4

         A.   Bank of America is Authorized to Require Continuous Wind Coverage on
             the Property. ........................................................................................................... 5

         B.   Plaintiff Fails to Identify Any Specific Contractual Term Prohibiting Payment of
             Commissions. ......................................................................................................... 8

    III.    Plaintiff Fails to State a Claim for Breach of the Implied Covenant of Good Faith
         and Fair Dealing. ......................................................................................................... 9

         A.   Ensuring Continuous Coverage Does Not Violate The Implied Covenant. ..................... 9

         B.   Failing to Seek Competitive Bids Does Not Violate The Implied Covenant. ............... 10

         C.   Compensation for Lender-Placement Does Not Violate The Implied Covenant........... 11

         D.   Increasing Plaintiff's Coverage Amount Does Not Violate The Implied Covenant...... 12

             1.   Plaintiff Lacks Standing to Challenge a Coverage Amount He Did Not Receive
                 and Did Not Pay For. ...................................................................................... 13

             2.   Bank of America Has The Discretion to Set its Windstorm Coverage
                 Requirements. ................................................................................................. 14

    CONCLUSION ............................................................................................................. 14

**INTRODUCTION**

Plaintiff David Holmes ("Plaintiff" or "Holmes") owns a home in West Palm Beach, Florida. On October 5, 2010, Holmes entered into a reverse mortgage with One Reverse Mortgage LLC, pledging his home as security for the property. Holmes acknowledges that, pursuant to that agreement, he was required to keep his home insured against "any hazards" and that, if he failed to do so, the lender was permitted to procure insurance for him. Holmes frankly admits that the policy he purchased did not cover wind damage. Nevertheless, he challenges two instances when Bank of America, N.A. ("Bank of America") placed windstorm insurance on his property.

Plaintiff first challenges the windstorm policy that Bank of America purchased on June 7, 2011 to be effective from October 12, 2010 (the "2010 policy"). Plaintiff also challenges the renewal of that policy (the "renewal policy"). Plaintiff challenges the 2010 policy on the grounds that Bank of America was not authorized under the mortgage agreement to place "retroactive" coverage. As to the renewal policy, Plaintiff challenges the fact that Bank of America renewed the policy at a higher coverage amount (the replacement cost of his property) than was previously in effect (his principal limit).

Plaintiff's claims ignore the plain language of his reverse mortgage, which expressly provides that he "shall insure all improvements on the Property, whether now in existence or subsequently erected, against **any hazards, casualties, and contingencies,** including fire. This insurance **shall be maintained** in the amounts, to the extent and for the periods required by Lender . . . ." The mortgage goes on to provide that, in the event Plaintiff fails to meet his obligations under the mortgage, Lender may "**do and pay whatever is necessary to protect the value of the Property** and Lender's rights in the Property, including payment of taxes, hazard

1

insurance and other items mentioned in Paragraph 2." Plaintiff's mortgage provided Defendant with the discretion to do exactly what is alleged here – purchase insurance in the amounts and for the time periods (including time periods already passed) it deemed necessary if the borrower himself did not do so.

Nor does he state a claim that Bank of America procured too much insurance. Bank of America acted within its rights when it protected the full value of the collateral. Indeed, it placed the insurance based on the value of the hazard insurance policy Plaintiff had previously procured. Moreover, Bank of America offered – and Plaintiff accepted – an invitation to "opt out" of the replacement cost coverage and reduce his coverage to his principal limit. Bank of America fully credited Plaintiff's account for the premiums he challenges. Against this backdrop, Plaintiff has suffered no injury and has no standing to challenge the coverage amount on the renewal policy.

## FACTUAL BACKGROUND

### I. Plaintiff's Allegations[1]

Plaintiff David Holmes lives in West Palm Beach, Florida. Compl. ¶ 10. On October 5, 2010 Plaintiff took out a reverse mortgage from One Reverse Mortgage, LLC in the amount of $64,125.00, posting his residence as collateral. *Id.* ¶ 18. Approximately one week later, Bank of America acquired the loan from One Reverse Mortgage, LLC, and has serviced the loan since that time. *Id.* ¶¶ 20-21. According to the Complaint, at the time the reverse mortgage was originated Plaintiff maintained a hazard insurance policy on the property that did not cover windstorm damage. *Id.* ¶¶ 25-26. On April 5, 2011, Bank of America sent Plaintiff a letter stating that it required wind coverage on his property and requested proof of that coverage. *Id.* ¶

---

[1] The allegations cited are from Plaintiff's Complaint and are intended only to aid in the Court's resolution of this Motion to Dismiss. By reciting these allegations, Bank of America does not admit them and reserves its right to dispute them.

28. After it did not receive proof of coverage in response to two warning letters, Bank of America purchased windstorm coverage in the amount of $24,966.00 on Plaintiff's behalf on June 7, 2011, effective as of October 12, 2010 (the date Bank of America began servicing Plaintiff's mortgage). *Id.* ¶¶ 29, 31. Although Plaintiff alleges Bank of America received a "commission" in connection with purchasing this coverage, Plaintiffs does not allege either the amount of the commission, or even the amount of insurance premiums he was charged for this policy.

On August 8, 2011, Bank of America informed Plaintiff that that policy was scheduled to renew on October 12, 2011 for the next policy year, and encouraged Plaintiff to provide proof of wind coverage before that time. Compl. ¶¶ 33-34. Plaintiff received a second warning letter on November 9, 2011, again asking him for proof of coverage; if not provided, Bank of America informed Plaintiff it would place coverage for him in the amount of $56,935.00, the amount of his last known hazard insurance policy. *Id.* ¶ 36. On January 13, 2012, after not being provided with proof of coverage in response to the November 9, 2011 letter or subsequent letters, Bank of America purchased windstorm coverage on Plaintiff's behalf, in the amount of $56,935.00. *Id.* ¶ 37. Included with the January 13, 2012 letter was a form allowing Plaintiff to "opt out" of windstorm coverage at the replacement cost value of his property, and instead elect to carry windstorm coverage in the amount of $26,925.01, Plaintiff's principal limit. *Id.* ¶ 39; *see also* January 13, 2012 Letter, Ex. 1.[2] Specifically, the opt-out form provided that:

> If you wish to lower the lender-placed insurance coverage amount to your current principal limit . . . check the box below, sign this form and mail the entire form to

---

[2] Because Plaintiff makes specific allegations about the contents of the letters and does not challenge their authenticity, these letters are incorporated into the Complaint and the Court may consider them without converting this motion into a motion for summary judgment. *See Kensington Volunteer Fire Dept., Inc. v. Montgomery Cty., Md.*, 684 F.3d 462, 467 (4th Cir. 2012) (in ruling on a motion to dismiss, the court "may consider documents attached to the complaint or the motion to dismiss so long as they are integral to the complaint and authentic" (internal quotation marks omitted)).

the address shown in the top right corner of this letter. . . . **Upon receipt of your request, we will cancel the current lender-placed insurance coverage and reissue with a coverage amount equal to your current principal limit**.

January 13, 2012 Letter, Ex. 1 (emphasis added). Plaintiff executed and returned the opt-out form to Bank of America. Compl. ¶ 40; Executed Opt-Out Form, Ex. 2. Bank of America subsequently issued Plaintiff a new policy in the lower amount of $26,925.01 and credited Plaintiff the difference between the two premiums. *Id.* ¶¶ 40-41.

Plaintiff filed suit on August 6, 2012, alleging claims against Bank of America for breach of contract and breach of the implied covenant of good faith and fair dealing. For the reasons stated below, Plaintiff fails to state a claim on either count.

## ARGUMENT

### I. Applicable Law

To survive a Rule 12(b)(6) motion to dismiss, a complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Laws v. Priority Trustee Servs. of N.C.*, 610 F. Supp. 2d 528, 530 (W.D.N.C. 2009) (quoting *Twombly*, 550 U.S. 544 at 570)). These allegations must consist of "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555. The court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The substance of Plaintiff's claims, according to Plaintiff's mortgage agreement, is governed by the law of Florida, the jurisdiction in which his property sits. Compl., Ex. A, at 7 ¶ 17 ("This Security Instrument is governed by Federal law and the law of the jurisdiction in which the Property is located.").

### II. Plaintiff Fails to Identify Any Contractual Term That Was Breached.

To state a breach of contract claim under Florida law, Plaintiff must plead: (1) the existence of a contract; (2) a (material) breach of that contract; and (3) resulting damages. *Vega*

4

*v. T-Mobile USA, Inc.,* 564 F.3d 1256, 1272 (11th Cir. 2009) (citing *Friedman v. N.Y. Life Ins. Co.*, 985 So.2d 56, 58 (Fla. 4th DCA 2008)). Where, as here, the language of an agreement is clear, the court is "required to enforce the contract according to its plain meaning." *Feldman v. Kritch*, 824 So. 2d 274, 277 (Fla. 4th DCA 2002); *Smith v. Shelton*, 970 So. 2d 450, 451 (Fla. 4th DCA 2007) ("The interpretation or construction of an unambiguous contract is a matter of law . . . ." (citation and internal quotation marks omitted)).

Plaintiff contends that Bank of America violated his mortgage agreement in two ways: first, with respect to the 2010 policy, because Bank of America purchased an allegedly "backdated" policy; and second – with respect to the 2010 policy and the renewal policy – because Bank of America "accept[ed] remuneration for itself in connection with force-placed insurance." Neither of these allegations states a claim. The mortgage agreement between Plaintiff and his lender gives Bank of America the right to "do and pay whatever is necessary to protect the value of the Property," which unquestionably encompasses requiring that Plaintiff, at a minimum, carry windstorm insurance up to the value of the property at all times to protect Bank of America's collateral. Likewise, Plaintiff cannot state a claim based on "remuneration" because he cannot point to any contractual provision that bars such compensation. Indeed, Plaintiff was expressly notified that such compensation might be paid in the event Plaintiff failed to purchase insurance on his own, but Plaintiff still failed to secure his own insurance.

> A. <u>Bank of America is Authorized to Require Continuous Wind Coverage on the Property.</u>

According to Plaintiff's mortgage agreement, Plaintiff is required to:

> insure all improvements on the Property, whether now in existence or subsequently erected, against **any hazards, casualties, and contingencies,** including fire. This insurance shall be maintained **in the amounts, to the extent and for the periods required by Lender** . . . ."

Compl., Ex. A, at 2 ¶ 3 (emphasis added). The import of this language is clear: the mortgage

vests Bank of America with the discretion to set the coverage amounts and periods for which Plaintiff is required to maintain insurance against hazards. The plain meaning of "hazard"– "a potential risk or danger" – unquestionably encompasses wind. *See* MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 572 (11th ed. 2003) (defining "hazard" as "a source of danger" or "a chance event; accident"); *see also* BLACK'S LAW DICTIONARY 786 (9th ed. 2009) (defining "hazard" as a "danger or peril").

Bank of America is likewise empowered by the mortgage agreement to "do and pay whatever is necessary to protect the value of the Property and Lender's rights in the Property, including payment of taxes, hazard insurance and other items mentioned in Paragraph 2." Compl., Ex. A, at 3 ¶ 5. By purchasing windstorm insurance to ensure continuous coverage at **all** times, Bank of America was doing no more than acting under the express authority with which the mortgage agreement vested it.

Despite the broad discretion the mortgage grants to Bank of America, Plaintiff – without identifying a single term of the mortgage that Bank of America allegedly breached – nevertheless contends that Bank of America was not allowed to place insurance to cover a recent prior time period during which he alleges there was no windstorm coverage and which accordingly left Bank of America unprotected. *See* Compl. ¶ 73 (alleging mortgage "does not allow Bank of America to purchase backdated wind insurance"). This is plainly wrong. The mortgage required Plaintiff to maintain insurance "**for the periods required by Lender**" and authorized the Lender to purchase such insurance if Plaintiff failed to do so. The mortgage does not contain any clause limiting this discretion to forward-looking coverage, but makes clear that the Lender may require coverage for any otherwise uninsured periods.

6

The court in *Schilke v. Wachovia Mortgage, FSB*, reached the same conclusion in denying that plaintiff's request for leave to amend to add a "backdating" claim against his lender:

> Ensuring that a property is adequately insured is a core part of a bank's lending activity. . . . Plaintiff does not claim that Wachovia has done anything other than what it was entitled to do under the contract: ensure that its interest in the property was protected with continuous, adequate insurance coverage. . . . Furthermore, before charging her for the continuous coverage that Wachovia's loan required, Wachovia chose to give Plaintiff several opportunities to prove that she had purchased her own coverage. Whether one calls that manner of protecting Wachovia's interest in the property "backdating" or just an effort at reasonable customer relations is of no moment. **Wachovia's contractual right was to have continuous coverage on the property.** Wachovia was not under any obligation to determine whether the property had suffered any damage from the date that Plaintiff had allowed her coverage to lapse.

820 F. Supp. 2d 825, 834 (N.D. Ill. 2011) (emphasis added). Here, similarly, Bank of America gave Plaintiff multiple opportunities to provide proof of wind coverage before placing on Plaintiff's behalf. *See, e.g.*, April 11, 2011 Letter, Ex. 3; May 9, 2011 Letter, Ex. 4. As Plaintiff was either unable to unwilling to provide proof of continuous wind coverage, Bank of America was entitled to protect its rights in the property for any coverage lapses. *See LaCroix v. U.S. Bank, N.A.,* Civ. No. 11-3326 (DSD/JJK), 2012 WL 2357602, at *5 (D. Minn. June 20, 2012) ("Backdating policies . . . ensures that the property is continuously covered in the event that a loss occurs during a period of insufficient coverage."); *Webb v. Chase Manhattan Mortg. Corp.*, No. 2:05-cv-0548, 2008 WL 2230696, at *17 (S.D. Ohio May 28, 2008) (retroactive coverage appropriate because the lender "had to ensure that the property was continuously covered in the event that a loss had occurred during the lapse in insurance coverage").[3]

---

[3] Plaintiff also misconstrues the nature and reasons for retroactive coverage. First, Plaintiff wrongly assumes he knew or would have known whether there was wind damage to the property during the coverage lapse. But considerable damage can remain latent for some time, unbeknownst to the occupant of the property. Second, even if there had been no damage, Plaintiff wrongly assumes – again – that Bank of America or its insurer would have known there was no damage. If Bank of America obtained only prospective coverage, in the event of a loss during the lapse there would have been no coverage to protect Bank of America's interest in the property.

In short, Bank of America had not only the right to require wind coverage in the "in the amounts, to the extent and for the periods" it required, but also to "do and pay whatever is necessary to protect the value of the Property." This discretion unquestionably encompasses the right to secure continuous windstorm coverage on the property when Plaintiff failed to do so on his own.

### B. Plaintiff Fails to Identify Any Specific Contractual Term Prohibiting Payment of Commissions.

Plaintiff also alleges that the mortgage does not allow Bank of America to "charge additional costs for the sole purpose of profiting Bank of America or its affiliates." This does not state a claim for breach of contract. First, Plaintiff fails to identify any specific contractual term that would prohibit Bank of America of its affiliates from receiving a commission for placing insurance – a common industry practice. Under Florida law, no claim for breach of contract can be maintained without alleging violation of a "specific provision" of the contract. *See Perret v. Wyndham Vacation Resorts, Inc.*, --- F. Supp. 2d ---, 2012 WL 3758036, at *9 (S.D. Fla. Aug. 28, 2012) (allegations of "unconscionable profit" insufficient to state a claim for breach of contract in absence of "allegations as to how these [charges] have violated any contract provisions"); *Dunkin' Donuts Franchised Rests. LLC v. Colonial Donuts, Inc.*, No. 6:07-cv-573, 2007 WL 1839421, at *2 (M.D. Fla. June 26, 2007). Plaintiff points to no phrase, clause, or provision of the mortgage prohibiting Bank of America from receiving compensation for the services involved in placing lender-placed insurance.

In fact, the mortgage authorizes Bank of America's alleged conduct: "[t]o protect Lender's security in the Property, Lender shall advance and charge to Borrower . . . **all sums due** to the loan servicer for servicing activities as defined in the Loan Agreement." Compl., Ex. A, at 3 ¶ 5 (emphasis added). Likewise, and as discussed above, the mortgage provides that in the

8

event of a breach by the borrower (such as, in this case, failing to secure appropriate insurance), Bank of America may "do and pay whatever is necessary to protect the value of the Property." *Id.*

Because Plaintiff fails to identify a material breach of the agreement, his breach of contract claim must be dismissed.

## III. <u>Plaintiff Fails to State a Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing</u>.

Plaintiff also claims Bank of America breached the implied covenant of good faith and fair dealing. Plaintiff contends Bank of America violated this covenant in four ways: (1) by "backdating" his windstorm coverage; (2) by "failing to seek competitively-priced insurance on the open market"; (3) by "passing off costs to Plaintiff associated with the force placement;" and (4) by renewing Plaintiff's coverage in an amount that was "more than double his outstanding principal balance . . . and subsequently placing the burden on Plaintiff to 'opt-out'" of that amount. Each of these proffered bases fails as a matter of law.

### A. <u>Ensuring Continuous Coverage Does Not Violate The Implied Covenant.</u>

It is hornbook Florida law that the implied covenant "cannot be used to vary the terms of an express contract." *Flagship Resort Dev. Corp. v. Interval Int'l, Inc.*, 28 So. 3d 915, 924 (Fla. 3d DCA 2010). Rather, any duty of good faith "must relate to the performance of an **express term of the contract** and is not an abstract and independent term of a contract which may be asserted as a source of breach when all other terms have been performed." *Perret*, 2012 WL 3758036, at *9 (emphasis added) (citation and internal quotation marks omitted); *see also* 11 FLA. JUR. 2D CONTRACTS § 272 (implied covenant "cannot be maintained under Florida law . . . in the absence of breach of an express term of the underlying contract"). For this reason alone, Plaintiff's implied covenant claim must be dismissed.

9

In *Perret*, for example, the plaintiff timeshare purchasers alleged that Wyndham violated their contracts and the covenant of good faith "by assessing unconscionably excessive management and maintenance fees far in excess of Wyndham's operating budget" and providing "assessment summaries that overstated the actual cost of services, enabling Defendants to make an unconscionable profit." *Id.* After dismissing the breach of contract claim because the plaintiffs (like Plaintiff Holmes) failed to allege that the conduct violated any specific contractual provisions, the court turned to the implied covenant of good faith and fair dealing claim. The court concluded that by alleging only that the charges did not "reflect the actual costs of services," the plaintiffs could not sustain a claim for violation of the implied covenant: "Plaintiffs cannot allege a general breach of the covenant of good faith and fair dealing; they must allege the breach in conjunction with a specific provision of a contract." *See id.*

As in *Perret*, Plaintiff here does not identify any term of the contract that precludes Bank of America from ensuring appropriate windstorm coverage on his property at **all** times, for **all** lapses – to the contrary, the mortgage provides Bank of America with the discretion to do precisely that. As Bank of America was entitled to purchase windstorm insurance to ensure continuous coverage on Plaintiff's property after Plaintiff failed to do so, Plaintiff cannot state a claim for breach of the implied covenant of good faith and fair dealing. *See Taylor v. Homecomings Fin., LLC*, 738 F. Supp. 2d 1257, 1264 (N.D. Fla. 2010) (lack of a contractual breach "necessarily indicates defendants also have not violated the implied covenant").

B.  <u>Failing to Seek Competitive Bids Does Not Violate The Implied Covenant.</u>

Plaintiff also contends Bank of America was required to seek "competitively-priced insurance on the open market" and violated the implied covenant of good faith and fair dealing by selecting providers "according to pre-arranged secret deals." Compl. ¶ 83(b). Not only does Plaintiff fail to allege that cheaper coverage was available to Bank of America, but

10

conspicuously absent from Plaintiff's allegations is any reference to a **specific contractual provision** that requires Bank of America to seek competitive bids for its lender-placed insurance policies. In the absence of any contractual provision limiting Bank of America's discretion to select the provider of its choice, this ground cannot support a claim for breach of the implied covenant. *See Silver v. Countrywide Home Loans, Inc.*, 760 F. Supp. 2d 1330, 1345 (S.D. Fla. 2011) (generalized "bad faith" allegation of mishandling mortgage modification does not state claim for breach of implied covenant when no contractual obligation to modify was identified).

        C.      <u>Compensation for Lender-Placement Does Not Violate The Implied Covenant.</u>

Plaintiff next contends Bank of America breached the implied covenant by "passing off costs to Plaintiff associated with the force placement that are profit to Bank of America." Compl. ¶ 83(c). As an initial matter, this vague, conclusory allegation is insufficient to satisfy Plaintiff's pleading obligations under Fed. R. Civ. P. 8(a). *See Twombly*, 550 U.S. at 570 (plaintiff must allege "enough facts to state a claim to relief that is plausible on its face"); *Laws*, 610 F. Supp. 2d at 530 (quoting *Twombly*, 550 U.S. 544 at 570)). Plaintiff does not allege what "costs" associated with lender-placement are profit to Bank of America and he does not even allege how much premium he was charged as to the 2010 policy. His allegations are wholly speculative and fail to state a claim for that reason alone.

Indeed, this allegation appears to challenge Bank of America's ability to earn income in connection with the purchase of a lender-placed insurance policy. Such a contention finds no support. *Perret*, 2012 WL 3758036, at *9 (conclusory allegations regarding unreasonableness of costs does not state claim for breach of implied covenant). In any event, Plaintiff once again is not able to point to any specific contractual provision that proscribes Bank of America from charging the cost of the policy to the borrower or earning income in connection with the placement of the policy.

11

Finally, the behavior Plaintiff claims amounts to "bad faith" was disclosed to the Plaintiff numerous times through Plaintiff's warning letters and could have been avoided if Plaintiff had purchased insurance from the provider of his choice as he was required to do under the mortgage.[4] Even after Bank of America purchased the insurance, it offered to refund the entire premium to Plaintiff if he would simply provide Bank of America with proof of adequate coverage he had purchased himself. Given these disclosures and the fact that Bank of America gave Plaintiff the opportunity to avoid the alleged "harm," there can be no lack of good faith as a matter of law. *See Schilke*, 820 F. Supp. 2d at 834-35 (no breach of contract for alleged "kickbacks" in connection with lender-placed insurance where no provision of contract prohibited such compensation and lender disclosed the insurance would include such compensation); *Taylor*, 738 F. Supp. 2d at 1263-64 (no violation of implied covenant of good faith and fair dealing where act alleged to have violated covenant was disclosed to borrowers beforehand).

D.   Increasing Plaintiff's Coverage Amount Does Not Violate The Implied Covenant.

Plaintiff finally contends that Bank of America breached the implied covenant of good faith and fair dealing by renewing Plaintiff's windstorm coverage at the same amount as his own hazard insurance coverage. Compl. ¶ 84(d). This allegation fails to state a claim because: (1) Plaintiff lacks standing to challenge any increased coverage amount because Plaintiff opted-out of the increased coverage and was fully refunded for it; and (2) Bank of America had the discretion to increase the amount of windstorm coverage to protect the value of Plaintiff's property.

---

[4] Bank of America expressly disclosed to Plaintiff that the insurance "may be purchased by us through agencies that are affiliates of Bank of America, N.A. Bank of America, N.A. and its affiliates may receive a commission or other compensation in connection with obtaining this coverage." *See, e.g.*, April 11, 2011 Letter, Ex. 3; May 9, 2011 Letter, Ex. 4.

### 1. *Plaintiff Lacks Standing to Challenge a Coverage Amount He Did Not Receive and Did Not Pay For.*

In order to meet the "irreducible constitutional minimum of standing," Plaintiff must plausibly allege: "(1) he has suffered an injury in fact; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *See Emery v. Roanoke City School Bd.*, 432 F.3d 294, 299-300 (4th Cir. 2005) (affirming dismissal of complaint where plaintiff had failed to establish injury-in-fact). Establishing an injury in fact is a "threshold requirement" to invoke the jurisdiction of the federal courts. *Miller v. Montgomery Cty., Md.*, 458 Fed. App'x 304, 308 (4th Cir. 2011) (no injury in fact in challenging denial of application for conservation exemption when plaintiff was not party who applied for exemption).

Here Plaintiff, by his own allegations, was fully credited for the premium associated with the increased coverage amount on the renewal policy, precluding any injury on that basis. Compl. ¶ 41. Indeed, Bank of America did not "require" the allegedly increased coverage at all. On November 9, 2011, Bank of America notified Plaintiff it was renewing the windstorm coverage and would be doing so at a higher coverage amount, based on the last known hazard insurance policy Plaintiff himself maintained on the property. Compl. ¶ 36; November 9, 2011 Letter, Ex. 5. After not receiving proof of any wind coverage, Bank of America informed Plaintiff by letter it had purchased $56,935.00 of windstorm coverage on his behalf. Compl. ¶ 37. With this notice, Bank of America included a form by which Plaintiff could reduce the amount of coverage from the replacement cost of his property ($56,935.00) to his principal limit ($26,925.01) – the same coverage level that was previously in effect. *See* January 13, 2012 Letter, Ex. 1. Plaintiff exercised this option and returned the signed form to Bank of America, reducing his coverage from $56,935.00 to $26,925.01. *See* Executed Opt-Out Form, Ex. 2.

Bank of America fully credited Plaintiff's account for any increased premium associated with the renewal policy and Plaintiff thus suffered no injury-in-fact. Compl. ¶ 40; January 26, 2012 Letter, Ex. 6.

> 2. *Bank of America Has The Discretion to Set its Windstorm Coverage Requirements*.

Even if Plaintiff did have standing, Plaintiff's claim is still deficient as he again ignores the plain language of his mortgage agreement, which provides that he is to maintain insurance "in the amounts, to the extent and for the periods" Bank of America requires. Compl., Ex. A, at 2 ¶ 3. Here, Plaintiff tries to use the implied covenant to **vary** the terms of the agreement he signed, which is just as impermissible under Florida law. *See City of Riviera Beach v. John's Towing*, 691 So. 2d 519, 521 (Fla. 4th DCA 1997). In *Riviera Beach*, a towing company contractor sued the City to recover storage charges under the towing and storage contract between the parties after a computer error by the city led the towing company to store a vehicle for several months longer than bargained for. *Id.* at 520. However, the towing agreement provided that the city was not responsible or liable "in any manner" for such storage charges. *Id.* Despite fault lying with the city, the court held that the towing company could not recover under the implied covenant because the contract "explicitly absolved the city" for all storage services. *Id.* Here, as in *Riviera Beach*, the contract is unambiguous that Plaintiff is required to maintain insurance in the amounts and periods set by Bank of America. Plaintiff, who was not even charged for any increased amount, cannot point to any contractual provision providing otherwise.

## CONCLUSION

For these reasons, Bank of America respectfully requests the Court dismiss Plaintiff's Complaint, with prejudice, for failing to state a claim upon which relief can be granted.

14

Dated:  September 28, 2012               Respectfully submitted:


/s/ David L. Permut_____
David L. Permut (*pro hac vice*)
dpermut@goodwinprocter.com
GOODWIN PROCTER LLP
901 New York Avenue, NW
Washington, DC 20001
T: (202) 346-4182
F: (202) 346-4444

Matthew G. Lindenbaum (*pro hac vice*)
mlindenbaum@goodwinprocter.com
Brian M. LaMacchia (*pro hac vice*)
blamacchia@goodwinprocter.com
David S. Kantrowitz (*pro hac vice*)
dkantrowitz@goodwinprocter.com
GOODWIN PROCTER LLP
Exchange Place
Boston, MA  02109
T: (617) 570-8318
F: (617) 523-1231


Bradley R. Kutrow, NC Bar No. 13851
bkutrow@mcguirewoods.com
Brian A. Kahn, NC Bar No. 29291
bkahn@mcguirewoods.com
Steven N. Baker, NC Bar No. 36607
sbaker@mcguirewoods.com
MCGUIREWOODS LLP
201 N. Tryon Street, Suite 3000
Charlotte, NC 28202
T: (704) 343-2262
F: (704) 353-6172

*Attorneys for Defendant Bank of America, N.A., for itself and as successor by merger to BAC Home Loans Servicing, L.P.*

15

## CERTIFICATE OF SERVICE

       I, David L. Permut, certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on September 28, 2012.


Dated:  September 28, 2012                  /s/  David L. Permut