# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA

### Case No. 3:12-cv-00487-MOC

|  |  |
|---|---|
| ) | |
| DAVID HOLMES, HERTA S. THEBERGE, MARGUERITE K. POTTER, and the MARGUERITE K. POTTER REVOCABLE TRUST, individually and on behalf of all others similarly situated, ) | |
| ) | |
| Plaintiffs, ) | |
| v. ) | |
| BANK OF AMERICA, N.A., in its own capacity and as successor by merger to BAC HOME LOANS SERVICING, L.P., SEATTLE SPECIALTY INSURANCE SERVICES, INC., in its own capacity and as successor in interest to COUNTRYWIDE INSURANCE SERVICES, INC., ILLINOIS UNION INSURANCE COMPANY, and CERTAIN UNDERWRITERS AT LLOYD'S LONDON, including all underwriters who underwrote force-placed wind insurance policies for Bank of America, as the insured during the applicable limitations period and LLOYD'S, UNDERWRITERS AT, LONDON, ) | **RULE 23 CLASS ACTION**<br><br>**FIRST AMENDED COMPLAINT**<br><br>**AND JURY TRIAL DEMAND** |
| ) | |
| Defendants. ) | |

---

### RULE 23 CLASS ACTION
### COMPLAINT & JURY TRIAL DEMAND

Plaintiffs David Holmes ("Holmes"), Herta S. Theberge ("Theberge"), Marguerite K.

Potter ("Ms. Potter"), and the Marguerite K. Potter Revocable Trust ("Potter Trust") (collectively

referred to as "Potter") (all collectively referred to as "Plaintiffs"), individually and on behalf of all others similarly situated, through their undersigned attorneys, set forth the following Complaint against Defendants Bank of America, N.A. ("BOA"), in its own capacity and as successor by merger to BAC Home Loans Servicing, L.P. ("BAC") (collectively, "Bank of America"), Seattle Specialty Insurance Services, Inc., in its own capacity and as successor in interest to Countrywide Insurance Services, Inc. (collectively, "Seattle Specialty"), Illinois Union Insurance Company ("Illinois Union"), Certain Underwriters at Lloyd's, London including all underwriters at Lloyd's London who underwrote force-placed wind insurance policies for Bank of America as the insured during the applicable statute of limitations period, and Lloyd's, Underwriters at, London (collectively, "Lloyd's") (all collectively referred to as "Defendants"):

## PRELIMINARY STATEMENT

1.      This is a nationwide class action on behalf of borrowers of loans serviced by Bank of America, who were force-placed with property insurance coverage on their secured property and/or those who procured property insurance coverage in an amount in excess of their contractual obligations after receiving a communication from Bank of America regarding its insurance requirements.

2.      Bank of America "force-places" (*i.e.*, forcefully purchases at the borrowers' expense) insurance coverage if borrowers do not continuously maintain the type and the amount of insurance that Bank of America unilaterally demands.

3.      Force-placed insurance (also referred to as "lender placed insurance") provides less coverage – which is often retroactive and more costly – than policies available on the open market.  Lenders obtain this force-placed insurance from insurance carriers with whom they maintain prearranged relationships.

2

4.     Borrowers' underlying mortgage documents and/or deeds of trusts typically contain language allowing the Lender to take action to protect its interest in the property if a borrower's required insurance, as set forth in the underlying contractual documents, lapses.

5.     Borrowers' underlying mortgage documents and/or deeds of trusts do not, however, authorize Bank of America to: (a) backdate insurance policies to include time periods that have already passed and during which *no* losses were incurred; or to (b) require borrowers to pay insurance premiums that include kickbacks, commissions and/or other consideration to Bank of America or its affiliates.

6.     Nonetheless, Bank of America regularly backdates policies and requires borrowers to pay insurance premiums that include kickbacks, commissions and/or other consideration.

7.     Bank of America also breaches its mortgage contracts with its borrowers by requiring them to carry insurance in excess of the amounts required by their mortgage agreements.

8.     Bank of America engages in all of these practices in bad faith and at the peril of borrowers, and ultimately mortgage investors.

9.     Based on the conduct as described herein, Plaintiffs assert claims individually and on behalf of the Classes defined below against Bank of America for breach of contract and breach of the implied covenant of good faith and fair dealing.

10.     Plaintiffs also assert unjust enrichment and tortious interference with contract claims on behalf of a Subclass of borrowers defined below against Seattle Specialty.  These claims are based upon Seattle Specialty's collection and retention of premium payments for wind insurance policies, its role in procuring worthless, backdated wind insurance coverage, and its

3

role in receiving and/or providing kickbacks, commissions and/or other consideration as part of the force-placed wind insurance process.

11.     Plaintiffs further assert a claim on behalf of two Subclasses of borrowers defined below for unjust enrichment against Illinois Union and Lloyd's for their collection of backdated insurance premiums.

12.     Plaintiffs and the Classes seek injunctive relief, corresponding declaratory relief, monetary damages, restitution and/or disgorgement, and all other appropriate relief for Defendants' unlawful conduct as described herein.

## PARTIES

13.     Plaintiff David Holmes resides in West Palm Beach, Florida.  Holmes is a member of several of the Classes defined below.

14.     Plaintiff Herta S. Theberge resides in Fort Myers, Florida.  Theberge is a member of several of the Classes defined below.

15.     Plaintiff Marguerite K. Potter resides in Boca Grande, Florida.  She is the trustee for a revocable trust known as the Marguerite K. Potter Revocable Trust.

16.     Plaintiff the Marguerite K. Potter Revocable Trust was created by trust instrument dated October 1, 2003.

17.     Both Ms. Potter and the Potter Trust are members of several of the Classes defined below.

18.     Defendant Bank of America, N.A. is a national banking association headquartered in Charlotte, North Carolina.  BOA does business in the State of Florida and most other states throughout the country.  As part of its business, BOA holds and services mortgage loans and lines of credit secured by real property.  BOA merged with BAC on or around July 1, 2011.

4

BOA is the successor-by-merger to BAC and is vested with all of the liabilities and assets of BAC as a result of the merger.

19.     Defendant BAC Home Loans Servicing, L.P. was a Texas limited partnership with its principal place of business in Calabasas, California.  BAC serviced loans and lines of credit originated or purchased by BOA, including loans and lines of credit maintained by borrowers within the State of Florida.  BAC's conduct was controlled, approved, authorized, enabled, and ratified by BOA.  BAC was a subsidiary of BOA.  BAC merged with BOA on or around July 1, 2011.  BAC did not survive the merger as an independent entity.

20.     Defendant Seattle Specialty Insurance Services, Inc. is a corporation headquartered in the State of Washington.  It is also the successor in interest to Countrywide Insurance Services, Inc.[1]  Seattle Specialty provides lender-placed insurance services to the

---

[1] Countrywide Insurance Services, Inc. was an affiliate of Bank of America.  *See* Press Release, *Bank of America Completes Sale of Balboa Insurance Business to QBE* (June 1, 2011) available at:  http://newsroom.___bankofamerica.com/press-release/residential-mortgage/bank-america-completes-sale-balboa-insurance-business-qbe (last visited October 19, 2012) (stating that Bank of America acquired Countrywide Financial Corporation in 2008) and http://finance.mapsofworld.com/company/c/countrywide-financial.html (last visited October 19, 2012) (listing Countrywide Insurance Services, Inc. as a subsidiary of Countrywide Financial).  Balboa Insurance Services, Inc. then became the successor-in-interest to Countrywide Insurance Services, Inc.  *See* Agency License Details for Balboa Insurance Services, Inc., available at http://interactive.web.insurance.ca.gov/webuser/Licw_Agy_Det$.STARTUP?Z_ORG_ID=1879 7&Z_AGY_LIC_NBR=0C17399 (last visited October 19, 2012).  In turn, Seattle Specialty became the successor-in-interest to Balboa Insurance Services, Inc. as part of the June 1, 2011 sale of Balboa affiliated entities from Bank of America to QBE Insurance Group.  *See* Press Release cited above; *see also* Testimony of Stephen Smith, Senior Vice President, Servicing Operations Executive for Bank of America, N.A. before the New York State Department of Financial Services (May 4, 2012) available at:
http://www.dfs.ny.gov/insurance/hearing/fp_052012/BANA_Testimony_of_Stephen_Smith.pdf (last visited October 19, 2012); ECF No. 36 at 2 (Illinois Union explaining in its memorandum in support of its motion to dismiss that it "provided coverage to Bank of America under a master policy pursuant to which Evidence of Insurance under that master policy was issued by Balboa Insurance Services, Inc."); *infra* at ¶¶ 46, 52 (Plaintiff Holmes' Evidence of Insurance pages listing Seattle Specialty as the agent and Illinois Union as the insurer).

financial services industry, including hazard, auto, collateral protection, flood, real estate owned property, and blanket insurance services. It also offers insurance tracking services for residential properties, commercial properties, manufactured homes, condominiums, farms, and residential mortgages. Seattle Specialty was founded in 1992. As of September 1, 2010, Seattle Specialty was sold to Sterling National Corporation ("Sterling"). Sterling is a member company of the QBE Insurance Group Limited ("QBE'). Seattle Specialty's website states that it is a member of QBE.[2]

21. Defendant Illinois Union Insurance Company is a surplus line insurance carrier with its principal place of business in Chicago, Illinois. Illinois Union operates under a letter of eligibility in the State of Florida but is virtually unregulated by that state and is not required to file its insurance rates there. *Force Placed Insurance—Mortgage Company Windfall?*, Searcy Blog (Feb. 24, 2012, 11:32 am), http://www.searcylaw.com/blog/force-placed-insurance-mortgage-company-windfall/ (last visited July 2, 2012). Illinois Union is a subsidiary of ACE USA, which is headquartered in Philadelphia, Pennsylvania. Illinois Union provides lender-placed insurance to Bank of America.

22. Defendant Lloyd's, Underwriters at, London is a surplus line carrier which operates under a letter of eligibility in the State of Florida. It has been given a FEIN number of

---

[2] The June 1, 2011 Outsourcing Agreement between Bank of America and QBE entities entered into as part of the sale discussed above governs the procurement of wind insurance by Seattle Specialty from surplus line carriers such as Illinois Union and Lloyd's. *See Testimony of Stephen Smith supra*. Also as a part of the deal, Bank of America affiliated entities receive a portion of QBE affiliates' revenue streams from lender-placed insurance business. *See* Testimony of Tim Burdick, Bank of America's Insurance Services Executive before the New York State Department of Financial Services (May 4, 2012) available at: http://www.dfs.ny.gov/insurance/hearing/fp_052012/BAISI_Testimony_of_Tim_Burdick.pdf (last visited October 19, 2012). This agreement thus gives Bank of America a direct financial interest in increasing the volume of QBE's force-placed insurance business.

98-0043838 and a Florida Company Code of S2170. It is not required to file its rates in Florida. Its home office is in the United Kingdom but it has a mailing address in New York City. It appears that this is the only Lloyd's entity which is eligible to write surplus lines insurance in Florida.

23.     Defendant Certain Underwriters at Lloyd's, London in this case are all the Names and/or Syndicates who underwrote force-placed wind insurance policies for Bank of America as the insured during the applicable statute of limitations period. Lloyd's of London is a franchise, created to facilitate the sale of insurance through franchisees. As part of this franchise, franchisees known as "Names" or "Underwriters" form Syndicates to underwrite insurance policies, including the force-placed wind insurance policies issued to the insured, Bank of America. These Syndicates are then managed by Managing Agents.

## JURISDICTION AND VENUE

24.     This Court has jurisdiction under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d)(2). Plaintiffs are citizens of the State of Florida, and Defendants are citizens of different states. The amount in controversy in this action exceeds $5,000,000.00, and there are more than 100 members of the Classes.

25.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Bank of America resides in this District and a substantial part of the events giving rise to Plaintiffs' claims arose in this District.

## FACTUAL ALLEGATIONS

### *Origination of Holmes' Loan*

26.     Holmes originally purchased the property at issue in approximately 1993.

27.     Holmes is retired and relies on an income of social security, pension benefits, and a modest part-time job.

7

28. On October 5, 2010, Holmes sought and obtained a reverse mortgage from One Reverse Mortgage, LLC in the amount of $64,125.00, secured by a lien on his property.

29. In connection with this loan, Holmes signed a Fixed Rate Home Equity Conversion Mortgage, attached hereto as Exhibit A, and a Quit Claim Deed attached hereto as Exhibit B.

30. On or about October 12, 2010, BOA purchased the loan from One Reverse Mortgage, LLC, becoming the lender-in-interest for Holmes' loan.

31. During the applicable time frame, both BOA and BAC serviced Holmes' loan.

### *Insurance Requirements for Holmes' Property*

32. Paragraph three of Holmes' mortgage agreement states: "Borrower shall insure all improvements on the Property, whether now or in existence or subsequently erected, against any hazards, casualties, and contingencies, including fire." *See* Exhibit A, ¶ 3.

33. Paragraph five of Holmes' mortgage states that if the borrower fails to pay for required insurance, "then Lender may do and pay whatever is necessary to protect the value of the Property and Lender's rights in the Property, including payment of taxes, hazard insurance and other items mentioned in Paragraph 2." *See* Exhibit A, ¶ 5.

34. Nowhere in Holmes' mortgage agreement does it explicitly require that Holmes maintain windstorm, hurricane, and hail ("wind") insurance coverage.

### *Bank of America Force-Placed Backdated Coverage on Holmes' Property*

35. At the time of his closing, Holmes maintained hazard insurance with Florida Family Insurance.

36.     Holmes' hazard insurance policy did not contain a wind provision, and therefore did not cover wind damage.  One Reverse Mortgage, LLC never informed Holmes that he needed to obtain an insurance policy to cover wind damage.

37.     On or around April 5, 2011, approximately six months after Bank of America bought and began servicing Holmes' loan, Bank of America sent Holmes a letter stating that he was required to maintain wind insurance.

38.     On June 7, 2011, Bank of America sent Holmes another letter, stating, in pertinent part:

> Per your loan agreement with us, we require you to maintain acceptable and continuous windstorm, hurricane and hail insurance on your home, until you pay off your loan.  Therefore, as provided for in the loan agreement, we have purchased insurance at your expense….  We will charge you an earned premium and any state-imposed fee for the period that no borrower-placed coverage was in place.

39.     The letter continued: "Lender-Placed Wind Insurance may be purchased by us through agencies that are affiliates of Bank of America, N.A.  Bank of America, N.A. and its affiliates may receive a commission or other compensation in connection with obtaining this coverage."

40.     The letter contained, as an enclosure, Evidence of Wind Insurance (EOI) for the wind insurance policy that Bank of America force-placed on Holmes.  This policy was with Illinois Union as the insurance company and had an effective date of October 12, 2010.  The effective date of this policy: a) was eight months *before* Bank of America purchased the wind insurance policy that it force-placed on Holmes; b) well before Bank of America's first notice to Holmes demanding the wind insurance coverage; and c) only one week after the date of Holmes' closing on his loan.  The coverage amount was for $24,966.00, which was approximately the

remaining principal balance of Holmes' loan at the time of the force-placement. The cost of the policy was $872.25.

41.     Holmes paid the premium, and never received a refund for the backdated insurance or for any other amount of the premium.

42.     On or around August 8, 2011, Holmes received another letter from Bank of America, informing him that the force-placed insurance policy he received just two months prior was scheduled to renew for another year on October 12, 2011.

43.     The letter stated that Holmes could mail proof of other wind coverage to Bank of America to stop the upcoming renewal. The letter also stated that should Bank of America renew the force-placed policy, it would "purchase coverage in the same amount" as the previous policy, and that "Bank of America, N.A. and its affiliates may receive a commission or other compensation in connection with obtaining this coverage."

44.     Holmes received an additional notice on October 2, 2011, warning that the renewed Lender-Placed coverage would provide a coverage amount of $26,521.00 and would cost $929.17.

45.     On November 9, 2011, Holmes received a letter notifying him that Bank of America would force-place him with wind insurance coverage in the amount of $56,935.00 ($31,969 more than mentioned in the October 2, 2011 and August 8, 2011 letters and more than had been force-placed the previous year) at a cost to him of $1,994.30 ($1,065.13 more than mentioned in the October 2, 2011 letter). Bank of America's letter does not explain why the coverage and premiums more than doubled from the previous notices.

46.     On January 13, 2012, Bank of America informed Holmes that it had force-placed $56,935.00 in coverage, at a premium of $1,994.30. Holmes also received an EOI for this policy

listing Seattle Specialty as the insurance agency and Illinois Union as the insurance company. This $56,935.00 in coverage greatly exceeded Bank of America's interest in the property. The policy went into effect on October 12, 2011 and expired on October 12, 2012.

47.     Also on January 13, 2012, Bank of America sent Holmes a letter explaining that "[t]he amount of lender-placed insurance coverage we obtained is based on the homeowners insurance coverage amount you last purchased or, if we did not have that information, then your current principal limit was used."

48.     The letter provided Holmes with the opportunity to "opt-out" of wind insurance coverage in the amount of his homeowner's insurance coverage, and instead elect to carry coverage up to the remaining principal balance on his loan ($26,925.01). The letter explained:

> Upon receipt of your request, we will cancel the current lender-placed insurance coverage and reissue with a coverage amount equal to your principal limit. We will then bill you the appropriate insurance charges for a one year term. If you request this coverage amount change, it will be effective as of the date your last insurance policy lapsed.

49.     This is the first time Holmes received the opportunity to limit his coverage amount to the remaining principal balance on his loan. Holmes followed the instructions in the letter and elected to carry wind insurance only up to the principal balance of his loan.

50.     Bank of America credited Holmes for the amount of the premium associated with the coverage in excess of his principal balance. Holmes is in the process of paying the remaining amount for the coverage.

51.     On or about August 8, 2012, Bank of America sent Holmes a letter stating that his force-placed wind policy "will renew for another year on 10/12/2012." In the letter, Bank of America falsely stated that it had purchased $96,000 of lender-placed insurance the previous year, and that it would purchase that same amount again if Holmes did not provide evidence of wind insurance coverage. The letter also stated that: "Lender-Placed Wind Insurance may be

purchased by us through agencies that are affiliates of Bank of America, N.A. Bank of America, N.A. and its affiliates may receive a commission or other compensation in connection with obtaining this coverage."

52.     On or about October 15, 2012, Holmes received another letter from Bank of America stating that it would be force-placing wind insurance coverage in the amount of $96,000 at a cost of $3,276. Enclosed with the letter was an EOI for this policy listing Seattle Specialty as the insurance agency and Certain Underwriters at Lloyd's, London[3] and Great Lakes Reinsurance (UK) PLC as the insurance companies. This coverage greatly exceeded Bank of America's interest in the property. This policy went into effect on October 12, 2012 and is set to expire on October 12, 2013. This letter also stated: "Lender-Placed Wind Insurance may be purchased by us through agencies that are affiliates of Bank of America, N.A. Bank of America, N.A. and its affiliates may receive a commission or other compensation in connection with obtaining this coverage."

53.     Also on October 15, 2012, Bank of America sent a letter to Holmes informing him that he could "opt-out" to the remaining principal balance of his loan ($28,174.27).

54.     Holmes intends to opt out of the coverage which exceeds his principal balance.

### *Origination of Theberge's Loan*

---

[3] There are several Lloyd's syndicates that list QBE Underwriting Limited as the syndicate's managing agent. *See* http://www.lloyds.com/lloyds/investor-relations/financial-performance/syndicate-reports-and-accounts?page=10 (last visited October 28, 2012). Several of these syndicates underwrite or have underwritten property insurance policies in the State of Florida. *See Richmond Manor Apts., Inc. et. al. v. Certain Underwriters at Lloyd's, London et. al.,* Fifth Amended Complaint, No. 09-60796-CIV-Altonaga/Brown, ECF No. 141, ¶¶ 6-7, (attached hereto as Exhibit F); ECF No. 141-1 Exhibit 1 to Fifth Amended Complaint (attached hereto as Exhibit G). Given the relationships between Bank of America and QBE entities, it is likely that a QBE related entity was involved in the force-placement of wind insurance on Holmes' property.

55. Theberge is an eighty-one year old widow who lives on a fixed income.

56. On or about April 12, 1996, Ms. Theberge and her now-deceased husband, Raymond Theberge, took out a $26,545.19 mortgage on their home with NationsBank of Florida, N.A. Theberge's mortgage agreement is attached hereto as Exhibit C.

57. BOA is the active successor in interest by merger to NationsBank, N.A., formerly known as NationsBank of Florida, N.A. (*see* Satisfaction of Mortgage attached hereto as Exhibit D) and, at relevant times to the instant action, was the lender-in-interest to Theberge's loan.

58. During the relevant time frame, both BOA and BAC serviced Theberge's loan.

### *Insurance Requirements for Theberge's Property*

59. Theberge's mortgage agreement provides as follows:

> Grantor shall keep the improvements, if any, now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage" and any other hazards, including floods or flooding, for which NationsBank requires in an amount equal ***to the lesser of*** (a) the current outstanding balance of the Note; (b) 100% of the maximum insurable value of the Property; or (c) for flood insurance only, 100% of the maximum amount of insurance required under any federal, state or local flood insurance program (if the Note secured is a TaxSmart loan, then parts (a) and (b) above are not required).

Exhibit C, ¶ 5 (emphasis added).

60. Theberge's mortgage agreement also states that the lender may obtain insurance and pay the premiums if the borrower fails to maintain the required coverage. *Id.*, ¶ 5. The mortgage agreement, however, also explains that the lender may only "do and pay whatever is necessary to protect the value of the Property and [the lender's] rights in the Property." *Id.*, ¶ 7.

61. Nowhere in Theberge's mortgage agreement does it explicitly require that she maintain windstorm, hurricane, and hail ("wind") coverage.

### *Bank of America Force-Placed Excessive and Backdated Wind Insurance Coverage on Theberge's Property*

62.     NationsBank of Florida, N.A. never informed Theberge that she needed to obtain an insurance policy to cover wind damage.

63.     On or about December 9, 2009, *thirteen years after she originated her loan*, Bank of America sent Theberge a letter stating that she was required to maintain wind insurance. The letter informed Theberge that if she did not purchase wind insurance, Bank of America would force-place $105,100 of wind coverage on her property at a cost of $3,624.12. This letter did not list for what time period the force-placed wind policy would be issued.

64.     The December 9, 2009 letter further stated that "the licensed insurance agency affiliates of ours **will** receive a commission for placing this insurance" (emphasis added).

65.     On or about December 23, 2009, Bank of America sent Theberge another notice stating that that Bank of America would be force-placing $105,100 of coverage if she did not obtain her own wind insurance. Again, the letter did not list the operative time period for the force-placed wind insurance coverage.

66.     On January 31, 2010, Bank of America sent Theberge a final notice stating that it had obtained a force-placed wind insurance policy on her home and that its licensed insurance affiliates would receive a commission for placing the insurance. This force-placed wind insurance was backdated *more than eight months* before the date of Bank of America's first notice of force-placement to Theberge and reflected an effective policy period of April 9, 2009 to April 9, 2010.

67.     The Evidence of Wind Insurance page sent to Theberge as an enclosure with the January 31, 2010 letter lists Countrywide Insurance Services, Inc. as the insurance agency and Certain Underwriter at Lloyd's, London as the insurance company.

68.     Theberge also received a letter dated January 31, 2010, providing her with the opportunity to "opt-out" of wind insurance coverage in the amount of her homeowner's insurance coverage, and instead elect to carry coverage up to the remaining principal balance on her loan ($5,096.44).

69.     After receiving the January 31, 2010 letters from Bank of America, Theberge subsequently complained to Bank of America multiple times regarding its force-placement of wind insurance.  Theberge also submitted formal complaints to the Comptroller of the Currency and the Office of U.S. Congressman Connie Mack.  Bank of America was aware of and responded to Theberge's complaints.  In none of those communications, including its response letters, did it offer to lower Theberge's wind insurance coverage amount to her unpaid principal balance.

70.     Based upon Bank of America's misrepresentations, and in order to avoid further charges for force-placed wind insurance, Theberge subsequently purchased over $105,000 of wind insurance coverage through Citizens Property Insurance Corporation.  The additional coverage went into effect on February 8, 2010.[4]

71.     In addition, Theberge, through her daughter Jane Miller, asked Theberge's hazard insurance agent if Theberge could purchase backdated wind insurance coverage to cover the previous nine months where Theberge had hazard coverage in place but no wind coverage.  Theberge's insurance agent told Ms. Miller that this was not possible.  She explained: "If the

---

[4] Theberge subsequently renewed her hazard policy (including wind coverage) through Citizens for the policy period February 8, 2011 to February 8, 2012.

Case 3:12-cv-00487-MOC   Document 40   Filed 10/30/12   Page 15 of 46

policy does not have wind coverage it cannot be purchased during the middle of the policy [sic] wind coverage can ONLY be purchased at renewal for that renewal period."[5]

72.     Bank of America subsequently refunded a portion of the premium it charged Theberge for the force-placed wind insurance ($596.00).  However, it did not refund the balance of the premium ($3,028.12).

73.     Theberge paid $3028.12 in full even though it caused a substantial hardship for her and her family.

74.     When Theberge's principal balance was paid off in or around the late summer or early fall of 2011, Bank of America insisted that she pay the remaining force-placed wind insurance premium in full in a lump sum and threatened to foreclose on her home if she did not do so.  Theberge was only able to make the lump sum payment with the assistance of friends and family.

### ***Bank of America Also Required Theberge to Purchase Excessive Flood Insurance Coverage***

75.     Beginning in at least 2008, Bank of America also insisted that Theberge carry flood insurance coverage in an amount that was substantially greater than her outstanding principal loan balance.

76.     For policy periods June 23, 2008 to June 23, 2009, and June 23, 2009 to June 23, 2010, Theberge purchased flood insurance coverage in the amount of $103,700 based upon Bank

---

[5] The fact that borrowers have no ability to purchase backdated insurance policies from private insurance companies has been confirmed by recent testimony before the National Association of Insurance Commissioners ("NAIC").  *See* Testimony of Robert P. Hartwig, NAIC Public Hearing on Private Lender-Placed Insurance, August 9, 2012 at p. 11 (retroactive coverage "is unheard of in the standard homeowners insurance market") and p. 16 (Homeowners cannot receive retroactive coverage through Citizens Property Insurance Corporation, a large Florida insurance company and Theberge's insurance provider) available at http://www.naic.org/documents/committees_c_120809_public_hearing_lender_placed_insurance _testimony_hartwig.pdf (last visited October 21, 2012).

16

of America's misrepresentations regarding the amount of coverage she was required to maintain. For policy period June 23, 2010 to June 23, 2011, she purchased $111,700 of flood insurance coverage based upon Bank of America's misrepresentations.

77.     Bank of America required these coverage amounts despite the fact that in June 2009 and June 2010, Theberge's principal loan balance was only approximately $6,000 and $3,500 respectively.

78.     On April 21, 2011, Bank of America sent Theberge a letter falsely claiming that it "requires flood insurance coverage that is equal to 100% of the replacement cost of the structure based on the current amount of hazard insurance for the property, or the maximum available coverage required by the National Flood Insurance Reform Act of 1997 (the Act), which is currently $250,000 for residential …. properties."  It then claimed that she had insufficient coverage and force-placed $11,170 of flood insurance coverage for a policy period of February 8, 2011 to February 8, 2012.  The notice also indicated that "our licensed affiliated agency may receive a commission for placing this insurance."[6]

79.     Theberge also purchased flood insurance coverage in the amount of $113,400 for the policy period June 23, 2011 to June 23, 2012, based upon Bank of America's misrepresentations.

80.     In a letter dated July 7, 2011, Bank of America again stated that it required flood insurance coverage equal to 100% of the replacement cost or $250,000.  The letter went on to state that it had performed an audit of Theberge's flood insurance and had found that the

---

[6] In a subsequent communication, Bank of America claimed that it fully reimbursed Theberge for this charge.

insurance policy on file had expired. It also informed Theberge that a lender-placed flood policy had been ordered and that she should contact her insurance carrier to avoid force-placement.

81. Bank of America never informed Theberge that it would accept flood insurance in an amount equal to her outstanding principal balance

82. In August 2011, Theberge carried an unpaid principal balance of under $200. Theberge fully paid off her mortgage later that year.

### *Origination of Potter's Loan*

83. Potter owns a residential property in Boca Grande, Florida, which is valued at approximately $4,184,000.00. On April 7 2011, Potter sought and obtained a mortgage from BOA, in the amount of $417,000.00, secured by the residential property.

84. In connection with this loan, Potter signed a mortgage agreement, a copy of which is attached hereto as Exhibit E.

85. During the applicable time frame, both BOA and BAC serviced Potter's loan.

### *Insurance Requirements for Potter's Property*

86. Paragraph five of Potter's mortgage agreement states, in pertinent part: "Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term 'extended coverage,' and any other hazards including, but not limited to, earthquakes and floods." *See* Exhibit E, ¶ 5.

87. Paragraph nine of Potter's mortgage agreement states that if the borrower fails to pay the required insurance, "the Lender may do and pay whatever is reasonable or appropriate to protect **the Lender's interest in the Property** and rights under this Security Instrument." *See* Exhibit E, ¶ 9 (emphasis added).

88. Nowhere in Potter's mortgage agreement does it explicitly require the maintenance of windstorm, hurricane, and hail ("wind") coverage.

### *Bank of America Force-Placed Backdated Coverage on Potter's Property*

89. Prior to closing the loan, Potter was required to provide proof of adequate insurance, which she provided in the form of an American Home Assurance Company policy providing homeowner's insurance coverage in the amount of $4,184,000.00. That insurance was accepted by Bank of America as adequate coverage for the loan at closing.

90. On or about June 2, 2011, Bank of America sent Ms. Potter a letter, informing her for the first time that she was required to maintain wind insurance coverage on her property.

91. The letter stated that Bank of America must receive evidence of wind insurance providing coverage effective April 12, 2011, a few days after Potter's mortgage agreement was signed, and predating the notification *by nearly two months*, or it would force-place coverage. The letter also notified Ms. Potter that the force-placed wind insurance coverage would cost $73,293.22 and would cover a policy period of April 12, 2011 to October 12, 2011.

92. Ms. Potter did not receive the June 2, 2011 letter at that time as she was out of town when it was sent, though she was having her mail properly forwarded to her. However, since Bank of America's letter was sent in an envelope marked "Return Services Requested" it was not forwarded to Potter. Instead, it was returned to Bank of America marked "Temporarily Away."

93. On August 2, 2011, Bank of America sent Ms. Potter another letter stating: "Per your loan agreement with us, we require you to maintain acceptable and continuous windstorm, hurricane and hail insurance on your home, until you pay off your loan. Therefore, as provided for in the loan agreement, we have purchased insurance at your expense."

94.     The letter continued: "Lender-Placed Wind Insurance may be purchased by us through agencies that are affiliates of Bank of America, N.A.  Bank of America, N.A. and its affiliates may receive a commission or other compensation in connection with obtaining this coverage."

95.     The letter contained, as an enclosure, an EOI for the policy Bank of America force-placed on Potter.  The EOI listed Seattle Specialty as the insurance agency and Illinois Union as the insurance company.  The policy provides wind insurance coverage for the entire value of the residential property ($4,184,000.00), which was ***approximately ten times*** Bank of America's interest in the property.  The policy was backdated, with a listed coverage period of April 12, 2011 to October 12, 2011.  The cost of the policy was $72,293.22.

96.     Ms. Potter was forced to pay the premium in full since it was automatically deducted by Bank of America from her escrow account and she never received a refund for any portion of the premium.

97.     Bank of America also sent another letter dated August 2, 2011, providing Ms. Potter with the opportunity to "opt-out" of wind insurance coverage in the amount of her homeowner's insurance coverage, and instead elect to carry coverage up to the remaining principal balance on her loan ($417,000).

98.     The opt-out letter stated that Ms. Potter had 35 days to mail her opt out request and that if she did not do so within that timeframe, "it shall be conclusively presumed that you have elected not to change the coverage amount" to the outstanding principal balance of the loan.

99.     Ms. Potter did not receive the August 2, 2011 letter because she was still out of town and did not return home until October.  As described above, she had a forwarding service in place but did not receive Bank of America's letter as it was marked "Return Service

20

Requested." This letter was also returned to Bank of America, marked "Temporarily Away." Due to the returned mail, Bank of America was obviously aware that Ms. Potter had not received its letters demanding wind insurance coverage. Nevertheless, there is no evidence that Bank of America made any other efforts to notify Ms. Potter of its purported wind insurance requirements.

100. When Ms. Potter returned to her residence in October she became aware, for the first time, of Bank of America's wind insurance coverage demands.

101. Ms. Potter received another notice from Bank of America dated October 26, 2011, informing her that Bank of America had again force-placed $4,184,000 of wind insurance coverage on her property for a coverage period of October 12, 2011 to April 12, 2012. Seattle Specialty was listed as the insurance agency for this policy and Illinois Union was listed as the insurer.

102. In conjunction with this force-placement, Bank of America offered Ms. Potter the opportunity to opt-out to wind insurance coverage in the amount of her unpaid principal balance ($405,542). Ms. Potter immediately did so.

103. On or about December 14, 2011, Bank of America subsequently force-placed a new wind policy based upon the unpaid principal balance of Potter's loan at a cost of $14,208.04 for a coverage period of October 12, 2011 to October 12, 2012. This policy also listed Seattle Specialty and Illinois Union as the insurance agency and insurance company respectively. This letter stated: "Lender-Placed Wind Insurance may be purchased by us through agencies that are affiliates of Bank of America, N.A. Bank of America, N.A. and its affiliates may receive a commission or other compensation in connection with obtaining this coverage[.]"

104. Ms. Potter asked Bank of America to refund the improper charges for force-placed wind insurance that it had already assessed against her account. When Bank of America refused to do so, Ms. Potter chose to pay off the loan in full. In order to do so, Bank of America required her to pay off all of the charges for the force-placed wind insurance coverage.

105. On February 2, 2012, Ms. Potter, through her then-counsel, sent a letter via certified mail to Bank of America demanding that it reimburse her for improperly force-placed wind insurance coverage. Ms. Potter did not receive a response from Bank of America.

### *Defendants Benefit from their Unlawful Force-Placement Policies and Practices*

106. In part, Bank of America's internal insurance requirements mandate that all borrowers maintain hazard insurance with a wind provision, or supply a supplemental wind policy if their hazard insurance policies do not contain a wind provision.

107. Bank of America's internal insurance requirements also mandate that borrowers whose homes are located in a special flood hazard area ("SFHA") maintain flood insurance.

108. During the applicable time frame, Bank of America and its insurance agencies (such as Seattle Specialty) tracked BOA's loans, including Plaintiffs' loans, to ensure that borrowers' insurance coverage complied with Bank of America's internal insurance requirements. Seattle Specialty describes its insurance tracking services on its website: http://www.seattlespecialty.com/Insurance_Tracking_Services/e-Trac. It offers these tracking services for secondary exposures (*e.g.*, flood, wind) and for residential mortgages.

109. Bank of America uses its own servicing systems, along with a proprietary insurance tracking program, to track insurance records on the properties of its serviced borrowers.

110. Bank of America sends uniform cycle letters to borrowers when the information

on file does not allegedly satisfy Bank of America's insurance requirements.

111.    In the event that the recipient of one of these cycle letters did not subsequently provide sufficient proof that the purportedly required insurance had been obtained, additional letters were sent requesting that the borrower do so.

112.    After a certain number of letters are sent, Bank of America force-places borrowers with property insurance policies (as applicable).  These policies are procured by Bank of America through insurance agencies, including Seattle Specialty.

113.    In accordance with the force-placement, another letter would be sent to borrowers, informing them of the placement and its cost.

114.    Borrowers have no say or input on the carriers or terms of the force-placed policies.  These are instead determined by Bank of America, the insurance agent, and the insurer.

115.    Bank of America has no incentive to comparison shop for the best rate for force-placed policies.  Rather, it is financially motivated to refer borrowers to the provider that will provide the best financial benefit to Bank of America and its affiliates with respect to commissions (*i.e.*, kickbacks) and/or other consideration.

116.    Bank of America's practice of unlawfully profiting from its force-placement of insurance policies keeps premiums for force-placed insurance artificially inflated over time because a percentage of borrowers' premiums are not being paid to cover actual risk, but are simply funding the illegal kickbacks.  The amounts paid to Bank of America and its affiliates as commissions and/or other remuneration have become a part of the cost of doing business for force-placed insurance providers.  As a result, force-placed insurance premiums incorporate the payment of such kickbacks -- to the detriment of Plaintiffs and the Classes defined herein.

117.    While Bank of America has profited greatly from its business of force-placing

insurance, it maintains a shroud of secrecy and does not separately report its income from payments received from providers of force-placed insurance. However, according to a recent article published by *American Banker*, "a cursory review of force-placed insurers' financials suggests that the business bring servicers hundreds of millions of dollars every year." *See* Jeff Horwitz, "Ties to Insurers Could Land Mortgage Servicers in More Trouble." ("Ties to Insurers") *Am. Banker* (Nov. 9, 2010), available at http://www.americanbanker.com/issues/175_216/ties-to-insurers-servicers-in-trouble-1028474-1.html (last visited July 2, 2012) (noting that servicers demand generous commissions and other payments in return for their referrals).

118.    The troubling alliances between lenders, loan servicers, insurance trackers, and force-placed insurance carriers have attracted attention in banking circles, including a recent exposé in *American Banker* magazine, which specifically highlighted Bank of America's relationship with Balboa. Ties to Insurers *supra*.  The article explains:

> When banks buy insurance on the homes of borrowers whose policies have lapsed, they get a great deal.  Just not for the homeowners and investors who have to pay for it.
>
> Nominally purchased to protect the owners of mortgage-backed securities, such "force-placed" insurance can be 10 times as costly as regular policies, raising struggling homeowners' debt loads, pushing them toward foreclosure — and worsening the loss to investors on each defaulted loan. Evidence of abuses and self-dealing in the force-placed insurance industry suggests that there may be far larger problems in how servicers are handling distressed loans than the sloppy document recording that has been the recent focus of industry woes.
>
> Behind banks' servicing insurance practices lie conflicts of interest that align servicers and their insurer partners against borrowers and investors. Bank of America Corp. owns a force-placed insurance subsidiary, and most other major servicers receive commissions or reinsurance fees on the very same policies they purchase on investors' and borrowers' behalf.

*Id.*

119.    Also in that article, the spokesman for the Department of Housing and Urban

Development is quoted as opining that practices like the one at issue here violate federal law. "It is clear that [the Real Estate Settlement Procedures Act] prohibits fee splitting and unearned fees for services that are not performed." *Id.*

120.    According to analysts, Bank of America's force-placed insurance practices are not just bad for borrowers, but they are also bad for investors. For example, at a mortgage-backed securities conference in 2010, analyst Laurie Goodman of Amherst Securities criticized Bank of America's higher-than-market rate of force-placed insurance, accusing Bank of America of hurting investors by stalling foreclosures in order to allow insurance companies to rack up profits for its above-market-priced forced-place insurance.

121.    Investor Fannie Mae is considering new rules to lessen the cost of the wrongfully inflated force-placed insurance. The investor is concerned that costly force-placed policies can push struggling homeowners into default or foreclosure; a problem exacerbated by the commissions (*i.e.*, kickbacks) and other remuneration insurance companies provide to banks and/or bank affiliates in connection with the force-placement. Commissions, according to the investor, "give the banks a financial incentive to choose the most expensive policy or to require unnecessary levels of coverage." *Fannie Mae Home Insurance Rules Won't Curb Many Abuses, Critics Say* (Apr. 2, 2012) available at http://www.huffingtonpost.com/2012/04/02/fannie-mae-home-insurance-rules-forced-place-policies_n_1396788.html (last visited July 2, 2012).

122.    Fannie Mae has also issued a Servicing Guide Announcement ("SGA") pertaining to lender-paced insurance. SGA SVC 2012-04 (March 14, 2012) available at https://www.efanniemae.com/sf/guides/ssg/annltrs/pdf/2012/svc1204.pdf (last visited October 23, 2012). In the SGA, Fannie Mae clarified its requirements relating to reasonable reimbursable expenses for lender-placed insurance, and stated that "reimbursement of lender-placed insurance

premiums must **exclude:**

- any lender-placed insurance commission earned on that policy by the servicer or any related entity;

- costs associated with insurance tracking or administration, or;

- any other costs beyond the actual cost of the lender-placed insurance policy premium."

*Id.* at 4 (emphasis in original).

123.    The New York Department of Financial Services ("NYDFS") recently conducted an investigation into the force-placed insurance industry.  Superintendent Benjamin N. Lawsky noted that the Department's initial inquiry uncovered "serious concerns and red flags" which included: (1) exponentially higher premiums for force-placed insurance than regular homeowners insurance; (2) extraordinarily low loss ratios; (3) harm to distressed borrowers; and (4) lack of competition in the market.  As Superintendent Lawsky noted:

> There … appears to be a web of tight relationships between the banks, their subsidiaries and insurers that have the potential to undermine normal market incentives and may contribute to other problematic practices.  In some cases this takes the form of large commissions being paid by insurers to the banks for what appears to be very little work.

*Force-Placed Insurance Hearings:  New York Department of Financial Services* (May 17, 2012) (Opening Remarks of Benjamin M. Lawsky, Superintendent of Financial Services) available at http://www.dfs.ny.gov/insurance/hearing/fp_052012/fp_trans_20120517.pdf (last visited October 23, 2012); *see also Under Interrogation,* American Banker (Jan. 27, 2012), available at http://www.americanbanker.com/news/force-placed-insurance-suboenas-1046159-1.html (last visited October 23, 2012; *Flurry of Subpoenas Raises Force-Placed Stakes,* American Banker (Jan. 27, 2012), available at http://www.americanbanker.com/issues/177_19/force-placed-insurance-subpoenas-probe-1046157-1.html (last visited October 23, 2012).

124.    J. Robert Hunter of the Consumer Federation also recently described common

force-placed insurance practices in his testimony before the NYDFS:

> In some instances, lenders use [force-placed] insurance as a profit center by collecting commissions from insurers through lender-affiliated agents or brokers or by receiving below-cost or free services (such as tracking of loans) from insurers, and/or using fronting primary insurers to direct the coverage to lender-affiliated captive reinsurers. Lenders often receive free or below cost service from affiliated service providers.

Available at http://www.dfs.ny.gov/insurance/hearing/fp_052012/Hunter_written_testimony.pdf

(last visited October 23, 2012).

125.     These hearings before the NYDFS have resulted in government action and findings that borrowers were, in fact, wrongfully overcharged for force-placed insurance.  On June 12, 2012, Governor Cuomo's official website announced, "DFS Investigation Indicates Insurance Companies Overcharged for Force-Placed Insurance."     Available     at http://www.governor.ny.gov/press/06122012DFS (last visited October 29, 2012).  It stated:

> The evidence of higher than necessary insurance premiums was made clear at a recent DFS hearing.  Also, the DFS discovered that the force-placed insurance market lacks the sort of competition that would keep premiums down.  In New York, two companies have 90% of the market. In addition, the hearings made clear that force-placed insurance costs are having a terrible impact on homeowners, while banks and insurers are profiting off the payments.

*Id.*

126.     Consistent with the unjust insurance practices outlined above and as described in the letters to Plaintiffs, Bank of America and/or its affiliated entities receive kickbacks, commissions, reinsurance premiums, discounted tracking services, and/or additional remuneration in connection with force-placement of insurance .

127.     Seattle Specialty, both in its own capacity and as successor in interest to Countrywide Insurance Services, actively facilitated and participated in Bank of America's abusive force-placed insurance practices as alleged herein.

128.    Seattle Specialty accepted handsome premium payments and/or other compensation for wind insurance policies that were force-placed by Bank of America, including policies that were wrongfully backdated to cover a time period which had already elapsed, during which no damage occurred, and which had coverage dates preceding Bank of America's first notice to the borrower that the insurance was required. Backdated insurance is not even available to consumers in the private market.

129.    To make matters worse, Seattle Specialty paid kickbacks in the form of "commissions" or other remuneration to Bank of America in connection with these wrongfully backdated and force-placed policies. Moreover, at least with respect to Seattle Specialty as successor in interest to Countrywide Insurance Services, Inc., it also received a commission, as disclosed in Bank of America's letter to Plaintiff Theberge. *See supra* ¶¶ 64, 66.

### *Defendants Benefit from Their Backdating Practices*

130.    Force-placed practices are also troublesome because they involve the backdating of insurance, in which coverage includes substantial time periods in the past when no recorded hail, wind, storm, or hurricane damage occurred, and for which Bank of America was on notice or could easily have been on notice that no such damage occurred.

131.    According to the National Association of Insurance Commissioners ("NAIC"), insurance is supposed to be "prospective in nature." Backdated insurance is contrary to this intent. The NAIC has made clear that policies "should ***not*** be back-dated to collect premiums for a time period that has already passed." Horwitz, *supra* (emphasis added).

132.    Backdating is especially troubling in the wind insurance context. It is an industry practice for insurance companies to subscribe to tracking and storm reporting services that provide the insurance company with data on wind speed, hail size, and other storm information

within a given geographic area. *See, e.g.*, http://www.munichre.com/en/reinsurance/ business/non-life/georisks/nathan/default.aspx___(last visited October 23, 2012)[7]; http://www.aer.com/industry/insurance (last visited October 22, 2012); http://www.iso.com/Products/ISO-ClaimSearch-Decision-Net/-Weather-Forensic-Reports.html#. UIVY4W_Acjx (last visited October 22, 2012). Equipped with all of this information, an insurance company could be confident that they were getting backdated premiums associated with no underlying risk. Thus, backdated insurance results in a windfall for insurance companies, because they obtain premiums from the consumer for a time period where there is no risk, and therefore no claims.

133. All of the Defendants benefitted from the force-placement of backdated wind insurance coverage, which covered time periods for which there was *no* risk of loss. Bank of America and/or its affiliated entities received kickbacks, commissions, reinsurance premiums, discounted tracking services, and/or additional remuneration in connection with this backdated force-placed wind insurance. Seattle Specialty obtained handsome premium payments and/or other compensation from these backdated insurance policies. Finally, Illinois Union and Lloyd's received premium payments for the backdated wind insurance coverage.

### *Similar Challenges to Force-Placed Practices Have Been Successful*

134. Borrowers in other cases have successfully challenged similar force-placed practices. *See, e.g.*, *Lass v. Bank of America, N.A.*, --- F.3d ---, 2012 WL 4240504 (1st Cir. Sept. 21, 2012) (reversing district court's dismissal of all of plaintiff's claims, including claims for breach of contract, breach of the covenant of good faith and fair dealing and unjust enrichment);

---

[7] In fact, Lloyd's and the company which administers this product are both insurers on Holmes' most recent force-placed policy and likely utilize this service or services that are similar. *See supra* ¶ 52.

*Kolbe v. BAC Home Loans Servicing, LP*, --- F.3d ---, 2012 WL 4240298 (1st Cir. Sept. 21, 2012) (reversing district court's dismissal of plaintiff's breach of contract and breach of the covenant of good faith and fair dealing claims); *Ulbrich v. GMAC Mort., LLC*, No. 11-62424, 2012 WL 3516499 (S.D. Fla. Aug. 15, 2012) (denying Balboa Insurance Services, Inc.'s motion to dismiss plaintiff's unjust enrichment claim based upon allegations involving backdating and kickback/commission allegations); *Arnett v. Bank of America, N.A.*, --- F. Supp. 2d ---, 2012 WL 2848425 (D. Or. July 11, 2012) (denying defendants' motion to dismiss as to plaintiff's breach of contract and breach of the implied covenant of good faith and fair dealing claims); *Gustafson v. Bank of America, N.A.*, No. SACV 11-915-JST, 2012 WL 4761733 (C.D. Cal. Apr. 12, 2012) (same); *McNeary-Calloway v. JP Morgan Chase Bank, N.A.*, No. C-11-03058, 2012 WL 1029502 (N.D. Cal. Mar. 26, 2012) (denying defendants' motion to dismiss in part as to plaintiff's breach of contract, breach of the implied covenant of good faith and fair dealing, and unjust enrichment claims, which addressed the backdating of insurance); *Williams v. Wells Fargo Bank*, *N.A.*, No. 11-21233 CIV, 2011 WL 4901346 (S.D. Fla. Oct. 14, 2011) (denying defendant's motion to dismiss plaintiff's claims for breach of the covenant of good faith and fair dealing and unjust enrichment).

## CLASS ACTION ALLEGATIONS

135.    Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.

136.    Plaintiffs assert their breach of contract and breach of the implied covenant of good faith and fair dealing claims (Counts I and II) on behalf of a Nationwide Force-Placed Wind Insurance Class defined as follows:

> All persons who have or had a loan or line of credit secured by property and serviced by Bank of America, and who were charged for lender-placed wind insurance and/or paid such charges to Bank of America, in whole or in part,

during the applicable statute of limitations period (the "Nationwide Force-Placed Wind Insurance Class").

137.    Plaintiff Theberge asserts her breach of contract and breach of the implied

covenant of good faith and fair dealing claims (Counts I and II) on behalf of a Nationwide

Excessive Insurance Class defined as follows:

- All persons who have or had a loan or line of credit secured by property and serviced by Bank of America; and
- Whose mortgages required property insurance coverage in an amount that is expressly determined and/or limited by the outstanding balance of the loan.  This class includes mortgages that expressly limit the amount of required property insurance coverage to no more than the outstanding balance of the loan or to a specified percentage of the outstanding balance of the loan.; and
- For whom Bank of America purchased and charged the cost of property insurance coverage in excess of the coverage amounts required by the mortgage agreements; and/or
- Who purchased property insurance coverage in excess of the coverage amounts required by the mortgage agreements after receiving one or more communications from Bank of America or its agent which stated that they were required by their mortgage to maintain property insurance in amounts that were, in fact, in excess of the coverage amounts required by the mortgage agreements (the "Nationwide Excessive Insurance Class").

138.    Plaintiffs assert their unjust enrichment and tortious interference with contractual

relations claims (Counts III and IV) on behalf of a Seattle Specialty Subclass defined as follows:

All persons in the Nationwide Force-Placed Wind Insurance Class whose force-placed wind insurance policies were purchased by Bank of America through insurance agent Seattle Specialty (the "Seattle Specialty Subclass").

139.    Plaintiffs Holmes and Potter assert their unjust enrichment claim (Count V) on

behalf of a Illinois Union Subclass defined as follows:

All persons in the Nationwide Force-Placed Wind Insurance Class whose force-placed wind insurance policies list Illinois Union as the insurer (the "Illinois Union Subclass").

140.    Plaintiff Theberge asserts her unjust enrichment claim (Count V) on behalf of a

Lloyd's Sub-Class defined as follows:

31

All persons in the Nationwide Force-Placed Wind Insurance Class whose force-placed insurance policies list Certain Underwriters at Lloyd's, London as the insurer (the "Lloyd's Subclass").

141.    The Classes and Subclasses defined above are collectively referred to as the "Classes."

142.    <u>Numerosity</u>:  The Classes are so numerous that joinder of all class members is impracticable.  Thousands of Bank of America's customers belong to the Classes.

143.    <u>Typicality</u>:  Plaintiffs' claims are typical of the members of the Classes.  Among other things: (1) Plaintiffs' loan documents are typical of those of other Class members; (2) the form letters that Plaintiffs received are typical of those received by other Class members; (3) Bank of America treated Plaintiffs consistent with other Class members in accordance with Bank of America's uniform policies and practices; (4) it was typical for Bank of America and/or its affiliates to receive kickbacks and other remuneration in connection with lender-placed insurance; (5) it was typical for Bank of America to backdate lender-placed insurance policies; and (6) it was typical for Bank of America to require and/or purchase insurance coverage in excess of what was required by the borrowers' mortgage agreements.

144.    <u>Adequacy</u>:  Plaintiffs will fairly and adequately protect the interests of the Classes, and has retained counsel experienced in complex class action litigation, including force-placed insurance litigation.  *See, e.*g., *Hofstetter v. Chase Home Fin. LLC*, No. 10-1313, 2011 WL 1225900, at *9 (N.D. Cal. Mar. 31, 2011) (finding Nichols Kaster to be adequate and appointing Nichols Kaster as class counsel in class action lawsuit asserting similar claims); *McNeary-Calloway v. JPMorgan Chase Bank, N.A. et al.*, No. 11-cv-03058-JCS, ECF No. 16 (N.D. Cal. Aug. 4, 2011) (appointing Kessler Topaz Meltzer & Check interim co-class counsel in a class action asserting similar claims.).

145. <u>Commonality</u>: Common questions of law and fact exist as to all members of the Classes and predominate over any questions solely affecting individual members of the Classes, including, without limitation:

a) Whether Bank of America wrongfully backdated insurance policies;

b) Whether Bank of America and/or its affiliates received improper kickbacks and/or other remuneration in connection with the force-placement of insurance policies;

c) Whether Bank of America required and/or purchased insurance coverage for borrowers in excess of what was required by their mortgage agreements;

d) Whether Bank of America required and/or purchased insurance coverage for borrowers which exceeded its interest in the property;

e) Whether Bank of America's conduct as described herein was authorized by the terms of the mortgage agreements;

f) Whether Bank of America violated its implied covenant of good faith and fair dealing;

g) Whether Seattle Specialty was unjustly enriched and tortiously interfered with Plaintiffs' and the Seattle Specialty Subclass members' contracts with Bank of America;

h) Whether Illinois Union was unjustly enriched;

i) Whether Lloyd's was unjustly enriched;

j) Whether Defendants are liable to Plaintiffs and members of the Classes for damages and/or restitution, and if so, the proper measures; and

k) Whether Plaintiffs and the Classes are entitled to declaratory or injunctive relief.

146. This case is maintainable as a class action under Fed. R. Civ. P. 23(b)(2) because Defendants have acted or refused to act on grounds that apply generally to the Classes, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Classes as a whole.

147. Class certification is also appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Classes predominate over any questions affecting only individual members of the Classes, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Defendants' conduct, described in this Complaint, stems from common and uniform policies and practices, resulting in unnecessary insurance premiums and related charges that are readily calculable from Defendants' records and other class-wide evidence. Members of the Classes do not have an interest in pursuing separate individual actions against Defendants, as the amount of each class member's individual claims is small compared to the expense and burden of individual prosecution. Class certification also will obviate the need for unduly duplicative litigation that might result in overlapping discovery and inconsistent judgments concerning Defendants' practices. Moreover, management of this action as a class action will not present any likely difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all Class members' claims in a single forum.

148. Plaintiffs intend to send notice to all members of the Classes to the extent required by Rule 23. The names and addresses of the Class members are available from Defendants' records.

## FIRST CLAIM FOR RELIEF

## BREACH OF CONTRACT

### (Against Bank of America on behalf of the Nationwide Force-Placed Wind Insurance Class and the Nationwide Excessive Insurance Class)

149.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

150.    Bank of America is the lender-in-interest and servicer of Plaintiffs' and the Classes' loans.

151.    Bank of America is the successor and assign of Plaintiffs' and members of the Classes' mortgage agreements and deeds of trust, and Bank of America is therefore bound by these contractual terms.

152.    Plaintiffs' mortgage agreements limit the lender's discretion to force-place insurance and charge the borrower for force-placed insurance.

153.    Pursuant to Plaintiff Holmes' and Theberge's mortgage agreements, in the event that a borrower fails to maintain required coverage, Bank of America may only "do and pay for whatever is necessary to protect the value of the Property and [Lender's] rights in the Property." *See* Exhibit A, ¶ 5; Exhibit C, ¶ 7.

154.    Similarly, according to the terms of Plaintiff Potter's mortgage agreement, in the event that Potter fails to maintain the required insurance, Bank of America may only "do and pay whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under [the] Security Instrument[.]"  *See* Exhibit E, ¶ 9.

155.    This language does not allow Bank of America to purchase backdated wind insurance, or to charge Plaintiffs additional costs for the sole purpose of profiting Bank of America or its affiliates.  Purchasing backdated insurance and steering a portion of the premiums to the lender (or the lender's affiliates) are neither appropriate nor necessary to protect the

lender's legitimate interests or rights. Nor are such actions otherwise authorized by the mortgage agreement. *See McNeary-Calloway*, 2012 WL 1029502, at *23 ("[B]road discretion is not unlimited discretion. Nothing in the contract necessarily authorizes charges regardless of amount and regardless of whether Defendants receive a portion of the premiums. Nor does anything in the contract authorize backdating FPI policies to cover periods of time where no loss occurred.").

156. Bank of America has breached the mortgage agreements and/or deeds of trust with Plaintiffs and the Nationwide Force-Placed Wind Insurance Class by charging borrowers for backdated policies and by accepting remuneration for itself and/or its affiliates in connection with force-placed insurance, while simultaneously passing the full cost of the premiums on to its borrowers.

157. Bank of America has also breached the mortgage agreements of Plaintiff Theberge and the Nationwide Excessive Insurance Class by requiring and/or force-placing property insurance coverage in excess of what was required by the explicit terms of Plaintiff Theberge's and the Nationwide Excessive Insurance Class' mortgage agreements. *See* Exhibit C, ¶ 5 (only requiring insurance coverage in the amount of the unpaid principal balance).

158. These breaches were willful and not the result of mistake or inadvertence. Bank of America systematically and pervasively force-placed backdated insurance policies, devised a scheme to profit itself and/or its affiliates through force-placement, and required excessive coverage in violation of express contractual terms.

159. As a direct result of this unlawful conduct, Plaintiffs and the Classes have been injured, and have suffered actual damages and monetary losses, in the form of increased insurance premiums, interest payments, and/or other charges.

160.     Plaintiffs and the Classes are entitled to recover their damages and other appropriate relief for the foregoing contractual breaches.

**SECOND CLAIM FOR RELIEF**

**BREACH OF CONTRACT**

**IMPLIED COVENANT OF GOOD FAITH & FAIR DEALING**

**(Against Bank of America on behalf of the Nationwide Force-Placed Wind Insurance Class and the Nationwide Excessive Insurance Class)**

161.     Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

162.     The mortgage agreements entered into by Plaintiffs and the Classes represent binding and enforceable contracts with Bank of America, whether as assigns or direct-parties to the contracts.

163.     Every contract, including these mortgage agreements, contains an implied covenant of good faith and fair dealing.

164.     The mortgage agreements provide Bank of America with authority to force-place and/or require Plaintiffs to purchase reasonable amounts of property insurance for reasonable periods of time, under appropriate circumstances.   However, the agreements also limit the lender's discretion in force-placing and/or requiring property insurance.  *See* Exhibit A, ¶ 5; Exhibit C, ¶ 7; Exhibit E, ¶ 9.

165.     In carrying out the terms of the contract, Bank of America had a duty and an obligation to exercise discretion and to act in good faith, with proper motive, and in congruence with borrowers' expectations.

166.     Bank of America breached this duty of good faith and fair dealing by, among other things:

    a.  force-placing backdated policies on Plaintiffs, which included time periods where no recorded damage to the property occurred without engaging in a reasonable inquiry to determine whether Plaintiffs' properties were subjected to any wind, storm, hail, or hurricane damage during this time;

    b.  failing to seek competitively-priced insurance on the open market and instead selecting force-placed insurance agents and providers according to pre-arranged secret deals whereby the insurance policies are continually purchased at excessive costs through the same companies in order to produce additional profits for Bank of America;

    c.  passing off costs to Plaintiffs associated with the force-placement that are profit to Bank of America;

    d.  arranging for kickbacks, commissions or other remuneration for itself and/or its affiliates in connection with force-placed insurance;

    e.  requiring and/or purchasing insurance coverage in excess of what was required by the Class members' mortgage agreements;

    f.  force-placing or attempting to force-place insurance coverage for Plaintiffs in an amount that was more than their outstanding principal balance (Bank of America's interest in the property); and

    g.  placing the burden on Plaintiffs to "opt-out" of excessive insurance coverage (when an "opt out" was even offered).

*See Gustafson* 2012 WL 4761733, at *4 ("While [d]efendants correctly identify that the Insurance Provision conferred upon them discretion to purchase force-placed hazard insurance at Plaintiff's expense, the FAC alleges facts that … could establish that [defendants] purchased force-placed insurance for the Property in amounts that exceeded the scope of the express

contract and/or in a manner that constituted an unreasonable exercise of their discretion under the Insurance Provision.").

167.    Bank of America systematically and willfully engaged in the forgoing conduct in bad faith, for the purpose of gaining unwarranted contractual and legal advantages, and to unfairly and unconscionably maximize revenue from Plaintiffs and the Classes.

168.    As a direct result of Bank of America's breaches of the implied covenant of good faith and fair dealing, Plaintiffs and the Classes have been injured and have suffered monetary losses in the form of increased insurance premiums, interest payments, and/or other charges.

169.    Plaintiffs and the Classes are entitled to recover their damages and other appropriate relief for the foregoing breaches of the implied covenant of good faith and fair dealing.

### THIRD CLAIM FOR RELIEF

**UNJUST ENRICHMENT/RESTITUTION/DISGORGEMENT**

**(Against Seattle Specialty on behalf of the Seattle Specialty Subclass)**

170.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

171.    Plaintiffs and the Seattle Specialty Subclass did not enter into contracts with Seattle Specialty for force-placed wind insurance coverage.

172.    As a result, there is no adequate remedy at law to compensate Plaintiffs and the Seattle Specialty Subclass for the money improperly taken from them and retained by Seattle Specialty.

173.    Seattle Specialty actively facilitated and participated in Bank of America's abusive force-placed insurance practices, and conspired with Bank of America to take advantage of Plaintiffs and the Seattle Specialty Subclass members.

174.    Seattle Specialty received a benefit from Plaintiffs and the Seattle Specialty Subclass in the form of premiums for force-placed insurance, and Seattle Specialty retained a portion of these payments.

175.    Retention of these premium payments by Seattle Specialty would be unjust and inequitable because: (1) backdated (*i.e.*, expired) insurance coverage provides no appreciable value to borrowers; (2) Seattle Specialty did not provide anything of real value in return for the premium payments that it received for already-expired coverage; (3) Seattle Specialty secured handsome premium payments through improper means by offering Bank of America commissions, kickbacks, or other compensation in connection with force-placed insurance coverage; and (4) at least with respect to Seattle Specialty as successor in interest to Countrywide Insurance Services, Inc., it also received a commission as disclosed in Bank of America's letter to Plaintiff Theberge.

176.    Because it would be unjust and inequitable for Seattle Specialty to retain such payments, Plaintiffs and the Seattle Specialty Subclass are entitled to restitution of all monies unjustly and inequitably retained.  Seattle Specialty cannot retain those payments in good conscience.

**FOURTH CLAIM FOR RELIEF**

**TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS**

**(Against Seattle Specialty on behalf of the Seattle Specialty Subclass)**

177.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

178.    Plaintiffs have a contractual relationship with Bank of America by virtue of their mortgage agreements and have legal rights under those contracts.  For example, Plaintiffs and the Seattle Specialty Subclass have a right not to be charged for backdated insurance coverage and

for exorbitant charges in bad faith which provide a financial windfall to Bank of America, its affiliated entities, and/or its insurance agencies (including Seattle Specialty).

179.    Seattle Specialty has knowledge of Plaintiffs' and the Seattle Specialty Subclasses' mortgage agreements with Bank of America.

180.    Seattle Specialty intentionally and unjustifiably procured breaches of Plaintiffs' and the Seattle Specialty Subclass' mortgage agreements by, *inter alia*: (1) paying kickbacks, commissions, or other compensation to Bank of America, and, at least with respect to Seattle Specialty as successor in interest to Countywide Insurance Services, Inc., also receiving a commission; (2) retaining a portion of the premiums for force-placed insurance; and (3) facilitating the force-placement of worthless, backdated insurance coverage on borrowers' properties.

181.    Plaintiffs and the Seattle Specialty Subclass have been damaged as a result of Seattle Specialty's interference with their mortgage agreements by being charged bad faith, exorbitant, and illegal charges for force-placed insurance in contravention of their rights under their mortgage agreements.

### FIFTH CLAIM FOR RELIEF

#### UNJUST ENRICHMENT/RESTITUTION/DISGORGEMENT

**(Against Illinois Union on behalf of the Illinois Union Subclass and Against Lloyd's on behalf of the Lloyd's Subclass)**

182.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

183.    Plaintiffs Holmes and Potter and the Illinois Union Subclass did not enter into contracts with Illinois Union for force-placed wind insurance coverage.

184.    Plaintiff Theberge and the Lloyd's Subclass did not enter into contracts with Lloyd's for force-placed wind insurance coverage.

185.    As a result, there is no adequate remedy at law to compensate Plaintiffs and the Illinois Union and Lloyd's Subclasses for the money improperly taken from them and retained by Illinois Union and Lloyd's in the form of backdated insurance premiums.

186.    Through Defendants' backdating scheme, Illinois Union and Lloyd's conferred a substantial benefit and were enriched.  Illinois Union and Lloyd's received premiums, covering past time periods with *no* recorded risk of loss according to well-documented weather records.

187.    Plaintiffs and the Illinois Union and Lloyd's Subclasses received no benefit from insurance coverage of past non-events.  Therefore, it would be unjust and inequitable to permit Illinois Union and Lloyd's to retain these premiums.

188.    Plaintiffs and members of the Illinois Union and Lloyd's Subclasses are entitled to restitution of all monies unjustly and inequitably retained in the form of backdated insurance, and/or disgorgement of profits realized by Illinois Union and Lloyd's in connection with backdated insurance.

## PRAYER FOR RELIEF

189.    WHEREFORE, Plaintiffs, individually and on behalf of the Classes, pray for relief as follows:

a)    A determination that this action may proceed as a class action under Rules 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure;

b)    The designation of Plaintiffs as representatives for the Classes;

c)    The designation of Plaintiffs' counsel as counsel for the Classes;

d)    The issuance of proper notice to the Classes at Defendants' expense;

e)    A declaration that Bank of America violated the terms of its contracts with borrowers and breached the duty of good faith and fair dealing;

f)        A declaration that Seattle Specialty was unjustly enriched;

g)        A declaration that Seattle Specialty tortiously interfered with the Seattle Specialty Subclass' mortgage agreements with Bank of America;

h)        A declaration that Illinois Union was unjustly enriched;

i)        A declaration that Lloyd's was unjustly enriched;

j)        A declaration that Defendants acted willfully and in deliberate or reckless disregard of applicable law and the rights of Plaintiffs and the Classes;

k)        An award of actual damages and interest;

l)        An award of reasonable attorneys' fees and costs to the extent permitted by applicable law;

m)        An award of restitution and/or disgorgement;

n)        An award of appropriate equitable relief, including, without limitation, an injunction requiring Bank of America to reverse all unlawful, unfair, or otherwise improper charges for property insurance coverage, prohibiting Bank of America and/or its affiliates from earning compensation on force-placed insurance policies, prohibiting Bank of America from purchasing backdated insurance coverage, and ordering Defendants to cease and desist from engaging in further unlawful conduct in the future; and

o)        The granting of other and further relief, in law or equity, as this Court may deem appropriate and just.

## <u>DEMAND FOR JURY TRIAL</u>

190.    Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs and the Classes demand a trial by jury.

Respectfully submitted,

Dated: October 30, 2012

/s/Sarah W. Steenhoek

**NICHOLS KASTER, PLLP**
E. Michelle Drake, MN Bar No. 0387366*
Sarah W. Steenhoek, MN Bar No. 389599*
      *admitted *pro hac vice*
4600 IDS Center
80 South 8th Street
Minneapolis, MN 55402
Telephone: (612) 256-3200
Fax: (612) 215-6870
E-mail:  drake@nka.com
             ssteenhoek@nka.com

**BERGER & MONTAGUE, P.C.**
Shanon J. Carson**
Lawrence Deutsch**
Robin Switzenbaum**
      ***pro hac vice* applications forthcoming
1622 Locust Street
Philadelphia, PA 19103
Telephone: (215) 875-4656
Fax: (215) 875-4604
Email:  scarson@bm.net
             ldeutsch@bm.net
             rswitzenbaum@bm.net

**TAUS, CEBULASH & LANDAU, LLP**
Brett Cebulash**
Kevin S. Landau**
      ***pro hac vice* applications forthcoming
80 Maiden Lane, Suite 1204
New York, NY 10038
Telephone:  (212) 931-0704
Fax:  (212) 931-0703
Email:  bcebulash@tcllaw.com
             klandau@tcllaw.com

**STOLL    STOLL    BERNE    LOKTING    &
SHLACHTER P.C.**
Scott A. Shorr**
Tim S. DeJong**

44

\*\*_pro hac vice_ applications forthcoming
209 S.W. Oak Street, Fifth Floor
Portland, Oregon 97204
Telephone:  (503) 227-1600
Fax:  (503) 227-6840
Email:    sshorr@stollberne.com
            tdejong@stollberne.com

**WHITEFIELD BRYSON & MASON, LLP**
Daniel K. Bryson, NC Bar No. 15781
Karl Amelchenko, NC Bar No. 43387
900 W. Morgan Street
Raleigh, NC  27603
Telephone: (919) 600-5000
Fax: (919) 600-5035
Email:   dan@wbmllp.com
            karl@wbmllp.com

**KESSLER TOPAZ MELTZER & CHECK, LLP**
Edward W. Ciolko\*\*
Donna Siegel Moffa\*\*
Amanda Trask\*\*
      \*\*_pro hac vice_ applications forthcoming
280 King of Prussia Road
Radnor, PA   19087
Telephone:  (610) 667-7706
Fax: (610) 667-7056
E-mail:  eciolko@ktmc.com
            dmoffa@ktmc.com
            atrask@ktmc.com

**GROSSMAN ROTH, P.A.**
Seth E. Miles\*\*
        \*\* _pro hac vice_ application forthcoming
2525 Ponce de Leon Blvd., Suite 1150
Coral Gables, FL 33134
Telephone: (888) 296-1681
Fax: (305) 285-1668
Email:  SEM@grossmanroth.com

**SHAPIRO HABER & URMY LLP**
Edward F. Haber\*\*
Adam S. Stewart\*\*
        \*\* _pro hac vice_ applications forthcoming
53 State Street
Boston, MA 02109

Telephone: (617) 439-3939
Fax: (617) 439-0134
Email:  ehaber@shulaw.com
   astewart@shulaw.com


**ATTORNEYS FOR PLAINTIFFS**
**AND THE  CLASSES**